THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* RONALD WILLIAMS *et al.*, Defendants-Appellants.

First District (4th Division)    No. 79-723

Opinion filed March 12, 1981.—Rehearing denied April 9, 1981.

Ralph Ruebner and Patricia Unsinn, both of State Appellate Defender's Office, of Chicago, for appellant Ronald Williams.

Julius Lucius Echeles and Frederick Cohn, both of Chicago, for appellant Mylon Cross.

Bernard Carey, State's Attorney, of Chicago (Marcia B. Orr, Myra J. Brown, and Mark A. Graf, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE LINN delivered the opinion of the court:

Mylon Cross and Ronald Williams were charged by an information filed on April 28, 1978 with the offenses of rape (Ill. Rev. Stat. 1977, ch. 38, par. 11—1) and deviate sexual assault (Ill. Rev. Stat. 1977, ch. 38, par. 11—3). The public defender was appointed to represent each defendant. On August 11, 1978 the information was amended to charge each defendant additionally with three counts of aggravated kidnapping (Ill. Rev. Stat. 1977, ch. 38, par. 10—2), three counts of kidnapping (Ill. Rev. Stat. 1977, ch. 38, par. 10—1), one count of unlawful restraint (Ill. Rev. Stat. 1977, ch. 38, par. 10—3) and two counts of aggravated battery (Ill. Rev. Stat. 1977, ch. 38, par. 12—4).

On September 11, 1978, the case proceeded to jury trial, and at the conclusion, verdicts were returned finding each defendant not guilty of one count of kidnapping, but guilty of all other charges. The trial court, however, entered judgment only on the guilty verdicts of rape, deviate sexual assault, three counts of aggravated kidnapping, and one count of aggravated battery.

On November 29, 1978, after denial of all post-trial motions, includ-

a petition for discharge, Mylon Cross was sentenced to concurrent terms of imprisonment of 30 years for rape and deviate sexual assault and 10 years for each count of aggravated kidnapping while Ronald Williams was sentenced to concurrent terms of imprisonment of 25 years for rape and deviate sexual assault and 10 years for each count of aggravated kidnapping. Defendants were not sentenced on the aggravated battery conviction.

On appeal, defendants contend: (1) they were denied their statutory right to a speedy trial (Ill. Rev. Stat. 1977, ch. 38, par. 103—5); (2) they were denied effective assistance of counsel (U. S. Const., amend. VI) because they were jointly represented despite the existence of a conflict of interest in their defenses; defendant Cross individually contends: (3) he was denied competent counsel because counsel failed to object to the admission of evidence which was the result of an illegal search; (4) the prosecutor improperly presented evidence of his post-arrest silence; (5) the trial court improperly allowed the prosecutor to present evidence of his co-defendant's statement which implicated him; (6) the trial court erred in admitting his statement given in violation of his *Miranda* rights (*Miranda v. Arizona* (1966), 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602); defendant Williams individually contends: (7) he was denied a fair trial by the prosecutor's improper and prejudicial closing arguments; and (8) the judgments and sentences on three counts of aggravated kidnapping were improperly entered.

We affirm the convictions for rape and deviate sexual assault, and we reverse the three aggravated kidnapping convictions and the one aggravated battery conviction on which judgments of guilty were entered.

Since defendants do not challenge the sufficiency of the evidence, only those facts necessary to resolve the issues raised will be stated.

The complainant testified that on April 13, 1978, while she was on her way to a liquor store, she saw the defendants. She had met the defendants previously when she was in the company of her boyfriend. The defendants were sitting in a white Cadillac car. Cross called to her. When she approached the car, she heard Cross tell Williams, "Get that bitch." Williams then grabbed her wrist, opened the car door, and shoved her inside the car. Cross grabbed her arms; Williams held onto her legs. The defendants then drove off with the complainant. As they drove along, the complainant attempted to escape, but Cross locked the car doors. He repeatedly slapped her face and told her he wanted her to be his whore.

They arrived at the DeGrace Hotel on Chicago's southside. Cross brandished a gun and told the complainant that if she tried to run away, he would kill her. Nevertheless, as they were getting out of the car, she again attempted to flee. Cross ran behind her and grabbed her. Again, he slapped her face and also threatened to kill her. Cross gave the gun he was

holding to Williams who held the gun to the complainant's back. The three then went to Cross' room in the hotel.

In the room, Cross put on a tape recording and ordered the complainant to remove her clothing. She refused. Cross then struck her across her face with his fist, knocking her to the floor. He kept striking her until the complainant removed her clothes. Cross then forced her onto the bed and penetrated her vagina with his penis. He did not climax. Cross then forced her to the floor and, with a belt, he beat her on her back and shoulders. He then forced her to perform fellatio upon him. When the complainant vomited, Cross beat her again until, at his direction, she licked the vomit off the floor and swallowed it.

The complainant further testified that Williams then forced her to lie on the bed and he penetrated her vagina with his penis. He then began slapping the complainant's face. At that moment, Cross struck Williams and told him no one could hit "that bitch" except him. He told Williams "to get him some." Williams then forced the complainant to perform an act of fellatio upon him while he beat her with a belt buckle. The complainant further asserted that Williams forced her to submit to sexual intercourse four times and Cross forced her to do so five times. Later, Cross made her go into the bathroom where he forced her to kneel and he then urinated on her face. He again told her she would be his whore.

At approximately 4 a.m., Cross told the complainant to turn on the lights in the room. She went towards the door, opened it, and, in a state of nakedness, escaped. As she fled from the hotel, she exclaimed to the hotel desk clerk that she had been raped. She then ran into the street. A cab driver, Warren Jamieson, saw the complainant, stopped his cab, and told her to get in. As she did so, she saw the defendants getting into their car. The cab driver and another car followed the defendants' car until the defendants stopped.

The complainant also testified that as a result of being beaten, her forehead and eyes were swollen and discolored and one of her eyes was cut which necessitated a later insertion of four stitches. She also stated that as a result of the beating and whipping she had received, her back and shoulders were permanently scarred. Photographs of her injuries were introduced into evidence.

Jamieson, the cab driver, and John Bonner, the driver of the other car which had followed the defendants' car, testified that they saw the complainant running from the DeGrace Hotel. She was naked. She was crying hysterically. Her face was badly bruised and swollen. They also explained how they drove after the defendants until the defendants' car stopped and the police arrived.

Defendant Williams did not testify. Cross, in his testimony, asserted that although they were in the hotel room, nothing unusual happened.

Cross said he had fallen asleep and Williams had gone out to get cigarettes. When Cross awoke, the complainant was gone. Cross denied that he or Williams forced the complainant into a car or into the hotel room. He also denied that the beating, rape, and deviate sexual assault occurred. He asserted that on many previous occasions he had had sex with the complainant. Several witnesses also testified that they knew Cross and the complainant had previously engaged in sexual relations.

In rebuttal, an assistant state's attorney testified to a prior inconsistent statement given to him by Cross. At the close of the evidence, the jury returned guilty verdicts on all charges except one count of kidnapping. Following the entry of judgment and sentencing as indicated, this appeal was filed.

OPINION

I

Defendants first contend that they were denied their statutory right to a speedy trial (Ill. Rev. Stat. 1977, ch. 38, par. 103—5) on the three charges of aggravated kidnapping and one charge of aggravated battery upon which judgments of guilty were entered and which were included in the nine new and additional charges filed on August 11, 1978. Both defendants and the State agree that the nine new and additional charges were filed on the 120th day after the defendants' arrest and that no dispute exists that defendants were tried within term time on the original charges.

■■ The speedy-trial statute provides that every person in custody for an alleged offense shall be tried within 120 days from the date he is taken into custody, unless delay is occasioned by the acts of the defendant. (Ill. Rev. Stat. 1977, ch. 38, par. 103—5.) With respect to offenses committed on or after March 1, 1977, such as here, any delay occasioned by the defendant temporarily tolls, for the time of the delay, the 120-day period within which defendant must be tried. (Ill. Rev. Stat. 1977, ch. 38, par. 103—5(f).) The speedy trial statute is tolled only when there has been actual delay of trial which is clearly attributable to the defendant. (*People v. Perkins* (1980), 90 Ill. App. 3d 975, 414 N.E.2d 110.) Thus, the inquiry in the instant case is whether some act of defendants, or some act to which they consented, necessitated a delay in their trial. *People v. Jones* (1971), 130 Ill. App. 2d 769, 266 N.E.2d 411.

The record discloses that the defendants were taken into custody on April 13, 1978. On April 28, 1978, they were arraigned on charges of rape and deviate sexual assault. The case was then continued, with defendants' consent, to May 9, 1978. On that date, defendants demanded trial. The State moved for a continuance to May 15, 1978. On May 15, the case was continued by agreement to June 15, 1978.

On June 15, defendants again demanded trial. The case was continued, on the State's motion, to June 26, 1978. On June 26, the State again obtained a continuance to July 24, 1978. On that date, on the State's motion, the case was again continued, and after another continuance on the State's motion, the trial was set for August 14, 1978. The foregoing continuances were granted despite the repeated demand of the defendants for trial.

On August 11, 1978, over defendants' objection, the trial court permitted the State to file nine new and additional charges against defendants. These charges arose from the same set of circumstances upon which the original charges were based. The new charges included three counts of aggravated kidnapping, three counts of kidnapping and two counts of aggravated battery and one count of unlawful restraint. Defendants thereupon requested a continuance of the matter to August 14, so that they could investigate grounds for a motion to strike those new charges. On August 14, the motion to strike the new charges was denied. The defendants, at that time, were arraigned on the nine new and additional charges and pleaded not guilty. Defendants, in view of the new and additional charges, then requested a 30 day continuances to prepare defenses. The defendants' request for a continuance was granted and the trial on all charges was continued to September 11, 1978. Trial began on that day.

■■ Defendants do not dispute that trial on the rape and deviate sexual assault charges began within the speedy-trial term.[1] They assert, however, that they were not tried on the nine new and additional charges within the speedy-trial term. Defendants argue that any continuances obtained by them prior to the filing of these new and additional charges cannot be attributed to them when computing the term time as to the nine new and additional charges. Defendants assert that these new and additional charges were filed on the 120th day of the term and because of this late filing defendants were forced, without fault on their part, to seek a continuance which delayed commencement of the trial until September 11. Defendants contend that the trial on the new and additional charges proceeded after the running of the term because of the State's inaction and in failing to file the new and additional charges in a timely fashion and the delay of the commencement of trial on September 11 cannot be attributed to the defendants. We agree.

■■ Where new and additional charges arise from the same facts as did the original charges and the State had knowledge of these facts at the commencement of the prosecution, the time within which trial is to begin

---

[1] To compute the speedy-trial term, the first day is excluded and the last day is included. (*People v. Solheim* (1977), 54 Ill. App. 3d 379, 369 N.E.2d 308.) According to our computation, trial on these charges commenced on the 116th day of the term.

on the new and additional charges is subject to the same statutory limitation that is applied to the original charges. Continuances obtained in connection with the trial of the original charges cannot be attributed to defendants with respect to the new and additional charges because these new and additional charges were not before the court when those continuances were obtained. (*People v. Williams* (1971), 2 Ill. App. 3d 993, 278 N.E.2d 408. See also *People v. Parker* (1978), 59 Ill. App. 3d 302, 375 N.E.2d 465; *People v. King* (1972), 8 Ill. App. 3d 2, 288 N.E.2d 672.) Thus, as defendants correctly maintain, the nine additional charges were filed on the 120th day of the term.

Defendants maintain that the State's filing of the new and additional charges compelled them to request a continuance to investigate possible defenses to these charges and, therefore, the State should be attributed with the delays caused by the continuances on August 11 and August 14. If the State, rather than the defendants, is chargeable with these delays, then defendants were tried on the new and additional charges after the 120-day term had expired.

■■ In our view, defendants should not have been charged with the delays of trial which occurred on August 11 and August 14. The State had the continuing burden to take the necessary steps to bring about a prompt trial in conformance with the provisions of the speedy-trial act. (*People v. Perkins* (1980), 90 Ill. App. 3d 975, 414 N.E.2d 110.) The record demonstrates that the State had knowledge of all facts necessary to file the new and additional charges long before August 11, 1978. Only the State's tardiness (for which the State has never offered an explanation) in filing the new and additional charges precluded commencement of prosecution on these charges within the speedy trial term. To charge defendants with a tolling of the term under these circumstances, especially where the need for time to effectuate discovery was essential, would circumvent the very protection the statute aimed to provide. (Accord, *People v. Nunnery* (1973), 54 Ill. 2d 372, 297 N.E.2d 129; *People v. Perkins* (1980), 90 Ill. App. 3d 975, 414 N.E.2d 110; *cf. People v. Shields* (1974), 58 Ill. 2d 202, 317 N.E.2d 529.) We necessarily conclude that the State violated defendants' statutory right to a speedy trial on the nine new charges.

The record discloses that in connection with the nine new and additional charges, the defendants were found guilty of and sentenced only on the aggravated kidnapping charges. A judgment of guilty but no sentence was entered on the aggravated battery charge. Accordingly, we direct that the trial court, on remand, vacate the judgments of conviction and the sentences imposed upon the defendants in connection with the aggravated kidnapping charges and the judgment of conviction on the aggravated battery charge.

Although our determination makes it necessary to vacate defendants'

aggravated kidnapping convictions and sentences, we find it unnecessary to remand the case for any new sentencing hearing. The record clearly discloses that the trial court imposed punishment for the aggravated kidnapping convictions as separate and distinct from the punishment imposed upon the convictions for rape and deviate sexual assault. Also, our decision here makes it unnecessary for us to address the issue raised by defendant Williams as to whether the judgments of conviction and sentences imposed on the aggravated kidnapping charges were improperly entered.

## II.

Defendants next contend they were denied effective assistance of counsel. This contention is based on several grounds.

### a.

The defendants assert that reversal of their convictions is required because an actual conflict of interest existed between them at trial—in that their defenses were antagonistic—yet, they were jointly represented by the public defender. Although each defendant was represented by an individual assistant public defender, the State does not challenge defendants' argument that they were jointly represented. Rather, the State maintains that joint representation was permissible because there was no actual conflict of interest between the defendants.

■■ Joint representation of co-defendants is not *per se* violative of the constitutional guarantee of effective assistance of counsel. (*People v. Nelson* (1980), 82 Ill. 2d 67, 411 N.E.2d 261. See also *Holloway v. Arkansas* (1978), 435 U.S. 475, 55 L. Ed. 2d 426, 98 S. Ct. 1173; *Glasser v. United States* (1942), 315 U.S. 60, 86 L. Ed. 680, 62 S. Ct. 457; *People v. Precup* (1978), 73 Ill. 2d 7, 382 N.E.2d 227.) "The question to be addressed in cases where co-defendants are jointly represented by one attorney or entity is whether there was an 'actual conflict of interest manifested at trial.' [Citations.]" (*People v. Nelson* (1980), 82 Ill. 2d 67, 72, 411 N.E.2d 261, 264.) The law is "firmly established that *when a timely objection to joint representation is made*" (emphasis added) (*People v. Precup* (1978), 73 Ill. 2d 11, 382 N.E.2d 227, 228), and "an actual conflict is identified" (*People v. Nelson* (1980), 82 Ill. 2d 67, 72, 411 N.E.2d 261, 264), but the court nonetheless requires joint representation of parties with conflicting or antagonistic interests, it is not required that a defendant prove that he has been prejudiced. *People v. Nelson; People v. Precup.*

Here, as in *Precup* and *Nelson*, defendants never suggested, at any time prior to or during trial or in post-trial motions, that a conflict of interest had arisen because their defenses were antagonistic. As in *Nelson*, no motion was made by the defendants here requesting independent

counsel for reason of conflicting or antagonistic defenses. It is true that defendant Cross orally moved for change of counsel because he was dissatisfied with counsel's preparation of the case. Defendant Cross, however, never claimed or informed the court of any genuine conflict or potential antagonism between his defense and that of Williams which could impair counsel's ability to fully and properly represent each of them. Although independent counsel for Cross filed post-trial motions, he challenged only the competency of Cross' trial attorney; the conflict of interest issue was never addressed.

The defendants now point to three developments at trial which they assert demonstrate an actual conflict of interest: Cross' testimony that he fell asleep while present in the hotel room with the complainant and Williams; the complainant's testimony that Cross hit Williams; and Officer Butler's testimony that at 1 a.m. he saw a tall light skinned man outside the DeGrace Hotel. With the benefit of hindsight, defendants urge that these evidentiary matters reveal defenses so antagonistic that an actual conflict of interest existed at trial which requires reversal. Implicit in defendants' contention is the presumption that the trial court should have *sua sponte* ordered a mistrial and severed the trial of the two defendants to avoid the error now urged on appeal. Our supreme court has explicitly rejected this argument in *People v. Precup* (1978), 73 Ill. 2d 7, 382 N.E.2d 227, and *People v. Berland* (1978), 74 Ill. 2d 286, 385 N.E.2d 649. As in *Precup*, there was no motion here for a severance and the issue is first raised on appeal. In *Precup*, the court held the issue waived. In *People v. Nelson* (1980), 82 Ill. 2d 67, 411 N.E.2d 261, the defendant there, as here, raised only the issue of incompetency of counsel, yet the court substantively addressed the conflict issue and concluded there was no conflict. According to the precedent of *Precup*, then, the issue has been waived. Even addressing the issue substantively as the court did in *Nelson*, we cannot discern from the record the actual conflict of interest between these defendants that is claimed to have existed.

Both defendants pled not guilty. Williams did not testify. Cross testified that he fell asleep in the hotel room shortly after 12 a.m. and "woke up on and off. Nothing occurred." He further asserted that Williams left the hotel room to get cigarettes about 10-15 minutes after they were in the hotel room. Williams did not return for sometime. Cross could not remember how long Williams had been gone. Cross did not see or hear Williams reenter the room, but when Cross awakened three or four hours later, Williams informed him that the complainant had answered the door and let him into the room. Cross denied that either he or Williams forced the complainant into the car or hotel room; Cross also denied that they had a gun.

Williams asserts that the clear import of this testimony is that Cross

was the perpetrator of the offenses. We disagree. Cross testified that nothing occurred and that Williams was gone for an uncertain period of time. Neither defendant presented an alibi defense, although Cross' version of the story which he gave to the police, but abandoned at trial, was in the nature of an alibi. In our view, the defenses were not antagonistic. The defense theory was that the complainant, who had previously engaged in sexual relations with Cross, went willingly with Cross and Williams to the hotel room but that nothing happened there.

In fact, the defendants attempted to show that the complainant had fabricated the defendant's involvement because of a "love triangle." The defendants presented evidence that Cross and complainant's boyfriend had argued about her and that she had once "chosen" Cross over her boyfriend. Defendants also presented evidence that the complainant's boyfriend had once threatened her with a knife. In closing argument, defense counsel suggested that the complainant had received her injuries from her boyfriend prior to meeting Cross and Williams and that the complainant had falsely accused the defendants of raping her because she was angry with them. In other words, the complainant was "pitting" the men against each other, to make her boyfriend jealous. None of the foregoing points to conflicting or antagonistic defenses.

Further, in our view, the defendants' defenses did not become antagonistic simply as a result of the introduction of Cross' prior inconsistent exculpatory statement to the police which was offered in rebuttal. In this statement, Cross indicated Williams was with the complainant while Cross was elsewhere. Cross, however, abandoned this defense at trial. The fact that Cross' testimony was impeached with this prior inconsistent statement did not mean that Cross' interest necessarily was hostile to the interest of Williams. Unlike *People v. Meng* (1977), 54 Ill. App. 3d 357, 369 N.E.2d 549, where each defendant attempted to inculpate the other and exculpate himself, here, neither defendant actually attempted to nor did he implicate the other at trial.

As further evidence of conflict, Williams points to the complainant's testimony that Cross hit Williams and told him to "get him some." Williams argues that independent counsel would have developed a defense of compulsion. (Ill. Rev. Stat. 1977, ch. 38, par. 7—11.) A close reading of the transcript, however, reveals that Cross did not hit Williams or tell him "to get him some" until *after* Williams had engaged in sexual intercourse with the complainant against her will and after he had hit her in the face. Williams engaged in sex with the complainant four times. After the first sex act he began slapping her face. The complainant testified that when he "got off her," Cross told him to "get him some." Williams "didn't want to do it, but Mylon Cross started hitting him * * *

so he got on top of me." Williams later forced the complainant to perform fellatio and he also struck her with a belt buckle. In our judgment this testimony hardly provides the basis for the defense of compulsion which counsel would pursue. The record reveals a vigorous cross-examination of the complainant. At best, whether or not independent counsel for Williams could have elicited facts showing compulsion is pure speculation.

Similarly, whether independent counsel would have developed a different strategy based on Officer Butler's testimony is pure conjecture. Butler testified that, at 1 a.m. on the night of the incident, he issued a ticket for a car illegally parked in front of the DeGrace Hotel. During this time, a tall man approached him and said the car belonged to his friend upstairs. Butler could not identify this man at trial and defense counsel opposed any identification testimony. Williams argues that since it was the State's theory that he was the man speaking with Butler, independent counsel would have "welcomed" the identification as it would place him "on the street" during the incident and absolve him of any wrongdoing. The complainant, however, testified that her ordeal took place over a period of four hours. Butler did not testify Williams was "on the street" for four hours.

We do not believe that any of the foregoing demonstrates a positive basis for finding an actual conflict of interest such as has been recognized by our supreme court in *People v. Ware* (1968), 39 Ill. 2d 66, 233 N.E.2d 421. There, a single attorney was appointed to represent two defendants. One defendant pleaded guilty and then testified as a State's witness against the other; thus there was a "complete antagonism between the defendants mandating a reversal * * *." (*People v. Berland* (1978), 74 Ill. 2d 286, 302, 385 N.E.2d 649, 656.) In *Berland,* the court held there was no conflict between co-defendants represented by a single attorney where both defendants pleaded not guilty and one did not testify while the other presented an alibi defense. Compare *People v. Berland* with *People v. Echols* (1978), 74 Ill. 2d 319, 385 N.E.2d 644.

We agree with the State that Williams' assertions are merely suggestions of possible alternative strategies and do not demonstrate a positive basis for actual hostility. While it is true that it is possible that independent counsel might have pursued the strategies Williams now suggests, it is also possible that such counsel would have acted no differently than the assistant public defender. "In short, we do not know what strategy independent counsel would have pursued," and we refuse to "[f]ind hostility between the interests of criminal co-defendants based on the mere possibility that one strategy available to defense counsel would have helped one defendant at the expense of another. [Citations.]" (*People v.*

*Echols* (1978), 74 Ill. 2d 319, 327-28, 385 N.E.2d 644, 648.) We find the supreme court's comments in *People v. Vriner* (1978), 74 Ill. 2d 329, 341-42, 385 N.E.2d 671, 676, supportive of our conclusion:

"In most criminal cases, strategy of counsel in presenting the defense must await the actual and perceived results of the prosecution's case. The final outcome invariably will disclose something that counsel could have done during the case that he did not do. Consequently, defense strategy in multiple representation situations often will invite, through hindsight, conceived notions that the representation adversely affected the interests of at least one defendant at some point in the trial process. For us now to say that the presentation of the defense in this case demonstrated that an impermissible conflict of interests existed from the outset of the trial would be tantamount to adoption of a *per se* rule which, absent a knowing waiver, would require separate representation of criminal codefendants in every case. Before we arrive at the point of reversing a conviction without requiring a showing of prejudice to the defendant, a positive basis must be found for concluding that an actual conflict of interests existed."

■■ ■ As in *Vriner*, we too conclude that an insufficient basis existed in this case for finding that there was an actual conflict of interests which denied defendants effective assistance of counsel.

b.

Defendant Cross additionally contends he was denied effective assistance of counsel due to the incompetency of his appointed counsel. He asserts that the trial court improperly denied his request for new counsel and that his appointed counsel failed to file a motion to suppress evidence obtained as a result of an illegal search. We first address Cross' motion to change counsel.

(1)

Defendant Cross moved for new counsel on the day of trial just prior to jury selection. The following colloquy occurred:

"Q. Ask for a change of counsel?

A. Yes sir.

Q. Today?

A. I just found out negative information, and today—yes, I'm asking today.

Q. Motion is denied. What is the reason. What did you find out?

A. I was told that I'd have conferences that I never got, okay. I was told that certain witnesses that I had advised him of from day one, that wasn't [*sic*] needed, and now they would get in touch

with them, and they are unavailable now, and it seemed like they are not trying to get my case together. All the points I think that it [*sic*] relevant to my case seem like they have been ignored."

The court then asked defense counsel for a response and they stated they felt they had done the best job they could in preparing the case. The trial court again denied the request.

Defendant Cross maintains that the foregoing transcript excerpt illustrates that he was not given an adequate hearing. He also urges that since his motion was *pro se*, his factual assertions were sufficient to require the court to make further inquiry. While we are aware that the trial court first denied the motion and then heard the merits, we are also cognizant of the trial court's dilemma: the court previously had given defendants a lengthy continuance to prepare an adequate defense on the new and additional charges, yet on the day of trial, Cross requested appointment of a new lawyer. Cross' motion, if granted, necessarily would have caused more delay. It is apparent that when defendant Cross provided the court with vague, nonspecific allegations, the court concluded the motion was dilatory. It is reasonable to conclude that the able trial court rejected its initial ruling denying defendant's motion; then promptly asked for and considered such other matters as were presented by Cross. Before making a final ruling, defendant Cross was in no way prejudiced by the trial court's initial ruling.

It is true that counsel of one's choice is a constitutional right, but like all constitutional rights, it is not without limits. (*People v. Koss* (1977), 52 Ill. App. 3d 605, 367 N.E.2d 1040.) It is within the trial court's sound discretion to grant or deny a continuance for the substitution of counsel (*People v. Solomon* (1962), 24 Ill. 2d 586, 182 N.E.2d 736.) A defendant, represented by court-appointed counsel, who on the day of trial requests a continuance to obtain a lawyer of his choice must " 'promptly and with some clarity' " express a reasonable basis for requiring the appointment of another lawyer. (*People v. Williams* (1976), 39 Ill. App. 3d 449, 454, 350 N.E.2d 135, 141.) The defendant must make an ascertainable showing that for good reason and without delay, he or someone for him, will be able to obtain other counsel. (*People v. Williams.*) If new counsel, specifically identifiable "stands ready, willing and able to make an unconditional entry of appearance instanter," the motion for a continuance to allow substitution of counsel should be allowed, otherwise the denial of the motion should not be considered an abuse of discretion. *People v. Koss* (1977), 52 Ill. App. 3d 605, 607-08, 367 N.E.2d 1040, 1041.

■■ Here, the defendant waited until the day of trial—almost five months after counsel had been appointed and had been acting for him—to request new counsel. Defendant Cross did not state that he had competent counsel who was ready and willing to represent him. Defendants'

counsel responded that they had prepared the case to the best of their ability. Defendant Cross did not assert that counsel was unprepared but rather that counsel had failed to contact certain witnesses[2] whom defendant thought were important. We agree with the State that Cross' remarks show that he did not agree with defense counsel as to the proper approach to his case. In view of the fact that the trial court was confronted with this motion on the day of the trial, that there was no specific allegation of lack of preparation and that no new counsel stood ready and able to represent defendant, we conclude that the denial of the motion was not an abuse of discretion. *People v. Heath* (1976), 35 Ill. App. 3d 880, 342 N.E.2d 452.

### III

Defendant Cross further maintains that his court-appointed counsel was incompetent because he failed to move for a motion "to suppress illegally obtained evidence." The inadequacy of a defendant's trial counsel entitled him to a new trial if his appointed counsel was actually incompetent, as reflected in the performance of his duties as trial attorney, and if this incompetence produced substantial prejudice to the defendant without which the result of the trial would probably have been different. (*People v. Greer* (1980), 79 Ill. 2d 103, 402 N.E.2d 203.) The competency of counsel depends upon the particular facts and circumstances of each case which are viewed in their totality from a review of the entire record, rather than a narrow focus upon isolated instances occurring during the course of trial. *People v. Gloster* (1980), 89 Ill. App. 3d 250, 411 N.E.2d 891.

As proof of incompetency, defendant Cross points to counsel's failure to move to suppress or to later object to the admission of evidence obtained by an allegedly illegal search. The State first argues the issue has been waived because it was never raised in the trial court. The State also maintains that the search was constitutional and, therefore, the evidence thereby obtained was properly admitted into evidence.

■■ We agree with the State that the issue of the illegal search has been waived. In the instant case, additional counsel failed to raise the issue in the post-trial motion. In *People v. Precup* (1978), 73 Ill. 2d 7, 382 N.E.2d 227, the supreme court held that defendant had waived the error of ineffective assistance of counsel because he had failed to assert that error

---

[2] Defendant relies upon *People v. Stepheny* (1970), 46 Ill. 2d 153, 263 N.E.2d 83. There, however, the trial counsel made no effort to locate and interview those persons present in an apartment at the time of the shooting and defendant presented the reviewing court with favorable evidence that was available at trial. Here, of course, only three people, according to Cross, were occurrence witnesses: the complainant, Cross, and Williams. More importantly, Cross had not shown this court that favorable evidence was available which trial counsel failed to obtain and to present.

at trial or in his post-trial motion. As in the instant case, additional counsel there was permitted to enter the case and to participate in the preparation of and argument in the motion for a new trial, but he failed to address the issue made on appeal. As in *Precup*, the issue here is considered waived. Even addressing the issue, it provides no basis for reversal.

After defendants were arrested and taken into custody, around 5:45 a.m., Officer Moran and police evidence technicians entered defendants' room at the DeGrace Hotel. They gained access by obtaining a key to the room from the hotel personnel. They took pictures of defendants' room which contained the complainant's clothing. At trial, these pictures were introduced into evidence without objection. The State did not present evidence that the officers' entry was consensual. The officers did not obtain a search warrant before entering Cross' room. Defendants argue that, absent exigent circumstances, the search was illegal and the evidence thereby obtained was inadmissible.

It is true that absent exigent circumstances or consent, a warrantless search and seizure of evidence is unreasonable and violates the fourth amendment. (*Mincey v. Arizona* (1978), 437 U.S. 385, 57 L. Ed. 2d 290, 98 S. Ct. 2408.) Here, defendants were in custody at the time of the search; the purpose of the search was to obtain the complainant's clothing. Defendants never consented to the search and recovery of a victim's clothing generally has not been recognized as an exigent circumstance, standing alone, which would justify a warrantless search.

■■ ■ We agree that the warrantless search here was unconstitutional (*People v. Hansen* (1980), 90 Ill. App. 3d 407, 413 N.E.2d 103), and hence the photographs of the victim's clothing, if objected to, would not have been admissible. We cannot say, however, that counsel's failure to object or to move to suppress the evidence descends to the state of ineffective assistance of counsel. Conceivably, the decision not to object may well have been a matter of strategy. (*People v. Grant* (1976), 38 Ill. App. 3d 62, 347 N.E.2d 244.) More importantly, the admission of the photographs was not prejudicial. Defendant Cross admitted he was in the room with the complainant who was undressed; he merely claimed that nothing had happened. The photographs of the complainant's clothing only served to show that the complainant was in defendant Cross' room. Since defendant Cross admitted he was there with the complainant, we are unable to discern how the outcome of the trial would have been different had the photographs not been admitted into evidence. Consequently, we conclude the alleged error was harmless beyond a reasonable doubt. *People v. Hansen.*

Accordingly, for the reasons noted, and because our search of the record discloses a hard-fought vigorous and skillful defense presented by counsel for defendants, we find the contentions as to alleged incompe-

tence of counsel as being without merit. We also conclude that the error in the introduction of the photographs was waived and, in any event, such alleged error was harmless beyond a reasonable doubt.

## IV

■■ Defendant Cross also contends that the prosecution improperly presented evidence to the jury that Cross remained silent after his arrest. Cross contends this was highly prejudicial to him. The State asserts, first, that the issue is waived because defendant failed to object to the evidence at trial or raise the alleged error in a post-trial motion and second, that defendant himself brought out the fact of his silence during his cross-examination testimony and therefore the evidence later admitted was not prejudicial. We agree with the State that the issue is waived. (*People v. Precup.*) We also note that even if this issue had not been waived, we would find no basis for reversal.

During Cross' cross-examination, the prosecutor questioned Cross as follows:

"Q. Did you * * * see a state's attorney at the police station?

A. He came in, yes, sir.

Q. And did you also talk to him?

A. Generally.

Q. All right. And did he advise you of your rights at that time?

A. I don't recall.

Q. Can you recall anything at all that you said to that State's Attorney in the police station?

A. He asked me how was it. How I'm doing.

Q. I'm sorry, sir. Can you say that again, please?

A. He asked me how was I doing. He advised me—I mean he told me about the case more or less generally. Asked me did I want to make a statement and help myself. Down that line.

Q. Do you recall, specifically, sir, making this statement to that person.

Did you say to him that you knew Christine but that you hadn't seen her in five days to a week?

A. I have heard that statement and I denied telling him that up until right now. I'm still denying it. No. I didn't tell him that.

Q. Do you also deny telling him, the State's Attorney, that you understood your rights?

A. I don't even recall him giving me my rights.

Q. All right. Do you deny telling the State's Attorney you had loaned your car to Ronald Williams during the evening?

A. He told me that Ronald said that I loaned him the car.

Q. Sir, I'm not asking you what Mr. Lerner told you. I'm asking you if you recall—

A. No, he didn't.

Q. Telling him—

A. No, I didn't tell him that. No, sir.

Q. Do you recall telling Mr. Lerner that upon leaving your mother's house that day, you went to visit several taverns looking for Mr. Williams and the car you had lent him?

A. No, I didn't tell him that.

\* \* \*

Q. Do you recall telling this State's Attorney that while you went up to that room [in the DeGrace Hotel] and had this argument with Ronald Williams, you never saw the victim there or rather Christine you never saw Christine at all when you went up to that room?

A. I refused to make a statement and told—we didn't talk about anything. Refused to make a statement in total. We didn't talk about anything.

\* \* \*

Q. Now did you also tell the State's Attorney that you wanted to take Mr. Williams home and not let him stay at the DeGrace Hotel because you were angry about the ticket?

A. No, I think I told him I was on my way home. He asked where was we going. I said to take Ronald home when we got stopped. [*sic*] I might have said that.

\* \* \*

Q. But you're saying you did not say that to the State's Attorney?

A. I'm saying when the State's Attorney came in, asked me for a statement, I refused to talk to him."

In rebuttal, the assistant state's attorney testified he had advised defendant of his *Miranda* rights and defendant had said he understood them. The assistant stated he then asked the defendant if he wanted to speak with him. The defendant indicated he did not want to talk. About 15 minutes later, the assistant returned, asked Cross whether he remembered the prior discussion of his rights. Cross indicated he did. The assistant then told Cross that he had spoken with Williams and he wanted to know if Cross wanted to tell him anything before he left. Cross then gave an exculpatory statement which directly contradicted his trial testimony.

The foregoing amply illustrates that defendant's reliance upon *Doyle v. Ohio* (1976), 426 U.S. 610, 49 L. Ed. 2d 91, 96 S. Ct. 2240, and related cases is misplaced. In *Doyle*, the Supreme Court held that the use of defendant's post-arrest silence for impeachment purposes violated due

process. There, the prosecutor, in an attempt to impeach defendant's defense, asked, "Q. And I assume you told [the arresting officer] all about [it]? A. No." (426 U.S. 610, 613, 49 L. Ed. 2d 91, 95, 96 S. Ct. 2240, 2243.) After defendant's objection was overruled, the prosecutor repeatedly asked the defendant why he didn't tell the arresting officer the story he was then telling the jury. The use of defendant's silence in this manner was deemed unfair because he had been assured in the *Miranda* rights given to him that he had the right to remain silent.

In the instant case, however, the prosecutor's questioning was not designed to draw meaning from the post-arrest silence, but, rather, to elicit an explanation for a prior inconsistent statement. *Doyle* does not apply to cross-examination which merely inquires into prior inconsistent statements. (*Anderson v. Charles* (1980), 447 U.S. 404, 65 L. Ed. 2d 222, 100 S. Ct. 2180.) Thus, defendant's answer—that he had refused to make a statement—was given gratuitously, and was not elicited by the prosecution.

■■ Since the jury had already heard from defendant on two occasions that he refused to speak after his arrest, the assistant's subsequent testimony which contained a single reference to this fact could hardly be deemed prejudicial error under *Doyle*. The assistant's testimony concerned the substance of defendant's statement, which was inconsistent with defendant's trial testimony. Thus, the purpose of his testimony was not to attest to defendant's post-arrest silence but to impeach defendant's trial testimony with a prior inconsistent statement. In view of defendant's prior testimony concerning his post-arrest silence, we find no prejudicial error occurred.

## V

Defendant Cross next contends that his constitutional right to confrontation was denied him when the prosecutor improperly presented evidence which indicated that co-defendant Williams, who did not testify, had made a statement implicating him. The defendant argues the alleged error is prejudicial even though the jury did not hear the content of the statement. Defendant argues he was prejudiced since the jury did hear argument by counsel as to the admissibility of the statement and could then speculate about the incriminating possibilities. The State maintains that there was no evidence presented that Williams made a statement implicating Cross, and, therefore, there was no error.

Defendant Cross relies upon *Bruton v. United States* (1968), 391 U.S. 123, 20 L. Ed. 2d 476, 88 S. Ct. 1620. *Bruton* holds that the introduction of an out-of-court statement by one co-defendant which implicates a second co-defendant, violates the latter's right of confrontation when the co-

defendant who made the statement cannot be subjected to cross-examination at trial.

■■ A conviction, however, is not automatically reversed upon the finding of a *Bruton* violation. When properly admitted evidence of guilt is overwhelming, and the prejudicial effect of the admission of the out-of-court statement is insignificant by comparison, the error is considered harmless error beyond a reasonable doubt. *Schneble v. Florida* (1972), 405 U.S. 427, 31 L. Ed. 2d 340, 92 S. Ct. 1056; see also *Parker v. Randolph* (1979), 442 U.S. 62, 60 L. Ed. 2d 713, 99 S. Ct. 2132.

Also, our supreme court has held that no violation of the *Bruton* rule occurs when the defendant claiming the benefit of the rule has made a similar inculpatory admission. *People v. Bassett* (1974), 56 Ill. 2d 285, 307 N.E.2d 359; *People v. Rosochacki* (1969), 41 Ill. 2d 483, 244 N.E.2d 136.

In the instant case, during the State's direct examination of an assistant state's attorney rebuttal witness, the following colloquy occurred:

"Q. And when you went to talk to Mylon Cross, what did you do then?

A. It was approximately fifteen minutes later I went back in and I asked him if he remembered what I had advised [*sic*] him of before, which he indicated he did.

Then, I told him that I had spoken with Mr. Williams and asked him if he wanted to tell me anything before I left."

Defendant Cross in effect contends that the foregoing dialogue shows that Williams made a statement implicating Cross and thus a *Bruton* violation occurred requiring reversal of his conviction. We decline defendant's invitation to extend *Bruton* to these facts. The assistant did not state that Williams had implicated Cross; he also did not testify to the substance of Williams' statement. There simply was no inculpatory statement introduced at the trial here as their was in *Bruton*.

Defendant also asserts that *United States v. Pinkerman* (4th Cir. 1967), 374 F.2d 988, necessitates reversal. There the testifying officer was asked whether as a result of talking with the co-defendant, a statement was procured from him. The officer answered affirmatively. Clearly this line of questioning is vastly different from the testimony given in the present case. Here, the assistant state's attorney testified that he told Cross that he, the assistant, had spoken with Williams. This is hardly tantamount to testifying that Williams gave a statement that impliedly implicated Cross.

Even if it was erroneous to allow this testimony, we would nonetheless consider it harmless in view of defendant Cross' earlier testimony that "[the assistant state's attorney] told me that Ronald [Williams] had said that I loaned him the car." Thus, prior to the assistant's testimony, the jury

was advised, by the defendant himself, as to what Williams and the assistant state's attorney had discussed. Defendant's testimony was the only evidence of what the assistant and Williams actually discussed. Accordingly, the prejudice, if any, that could have resulted from the assistant's testimony was negated by defendant's earlier testimony. We conclude that defendant's contention affords no basis for reversal.

## VI

Defendant Cross individually next contends that the trial court erred in admitting rebuttal evidence of a statement made by him because the statement was given in violation of his *Miranda* rights. The State maintains first, that defendant has waived the issue and, second, that the statement was voluntarily given and no *Miranda* violation occurred.

▪▪▪ We agree that the issue is waived under *People v. Precup* because it was never raised in the post-trial motion filed by independent counsel. Even if we were to find that there was no waiver, we would still find Cross' contention to be without merit. It is indisputable that statements obtained in violation of *Miranda* warnings may be admissible where introduced solely to impeach a defendant's credibility (*Oregon v. Hass* (1975), 420 U.S. 714, 43 L. Ed. 2d 570, 95 S. Ct. 1215; *Harris v. New York* (1971), 401 U.S. 222, 28 L. Ed. 2d 1, 91 S. Ct. 643), so long as the statements introduced are the " 'product of a rational intellect and a free will' (citation)." (*Mincey v. Arizona* (1978), 437 U.S. 385, 398, 57 L. Ed. 2d 290, 98 S. Ct. 2408.) Accordingly, we need not decide whether Cross' statement was obtained in violation of *Miranda*, since the statement, if voluntarily given, was properly admitted to impeach defendant's trial testimony. (*Oregon v. Hass* (1975), 420 U.S. 714, 43 L. Ed. 2d 570, 95 S. Ct. 1215.) We must, then, measure the statements given by Cross according to "[t]raditional standards for evaluating voluntariness and trustworthiness." *Oregon v. Hass* (1975), 420 U.S. 714, 723, 43 L. Ed. 2d 570, 95 S. Ct. 1215.

In the instant case, Cross testified on direct examination that he was present in the hotel room with the complainant but that nothing happened. When the State attempted to impeach this testimony by asking him about his prior inconsistent statement given to the assistant state's attorney, Cross denied that he ever made that statement. In rebuttal, the assistant state's attorney who obtained the statement testified that he first informed Cross of his *Miranda* rights and Cross said that he understood them. Cross stated that he did not want to talk and the assistant left the room. When the assistant returned 15 minutes later, he again referred to Cross' *Miranda* rights and Cross said that he remembered the prior discussion. After mentioning that he had spoken to Williams, the assistant asked Cross if he

wanted to tell him anything before he left. Cross then gave him an exculpatory statement which was contrary to Cross' testimony on direct examination.

Whether a statement is voluntarily given depends upon the totality of the circumstances. The test is whether it has been made freely, voluntarily, and without compulsion or inducement of any sort, or whether the defendant's will was overcome at the time he confessed. *People v. Prim* (1972), 53 Ill. 2d 62, 289 N.E.2d 601.

Here, defendant was not hospitalized, confused, in great pain, and repeatedly requesting a lawyer as the defendant in *Mincey v. Arizona* (1978), 437 U.S. 385, 57 L. Ed. 2d 290, 98 S. Ct. 2408. Clearly, the statement given in *Mincey* was not the product of a free will; rather, there, the defendant's will was overborne by the police officer's actions. In marked contrast to *Mincey*, where the Supreme Court held the statement was given involuntarily, there is no evidence here that defendant's will was overborne or that the assistant state's attorney acted in an abusive or coercive manner. We also note the record discloses that defendant was not new to the criminal justice system: he had been convicted of armed robbery twice before and of burglary once before. Thus, we are confident that when the assistant called Cross' attention to his *Miranda* rights, and Cross said he understood them, Cross indeed did understand their significance. From our analysis of the facts here, we conclude the statement given by Cross was voluntarily given and therefore properly admitted as rebuttal evidence for the sole purpose of impeaching Cross' credibility. The issue of a violation of *Miranda* rights is not present under the circumstances that existed here.

## VII

Defendant Williams individually contends that reversible error occurred when the assistant state's attorney commented, during closing argument, that the evidence was uncontroverted and then in rebuttal stated:

"They have given you no reason why she would lie * * *

* * *

Why she would lie * * *

* * *

I'd submit to you that the truth you have heard came from Christine. For if there was any such evidence of why she would lie, you would have heard it. And you didn't. And I do not apologize for Christine. I would bring her into a court of law to testify any day of the week * * *."

With respect to the State's comment that the evidence was uncontro-

verted, we find nothing improper or prejudicial in that statement. By statute (Ill. Rev. Stat. 1977, ch. 38, par. 155—1) and by Federal Constitution (see *Griffin v. California* (1965), 380 U.S. 609, 14 L. Ed. 2d 106, 85 S. Ct. 1229), the court and the prosecutor are forbidden from making any direct reference to a defendant's failure to testify. (*People v. Burton* (1969), 44 Ill. 2d 53, 254 N.E.2d 527.) The prosecution may, however, refer to the fact that the testimony of the State's witnesses is uncontradicted even though the defendant is the only person who could have contradicted it. (*People v. Mills* (1968), 40 Ill. 2d 4, 237 N.E.2d 697.) The test to be applied in such a situation is whether the references were " 'intended or calculated to direct the attention of the jury to the defendant's neglect to avail himself of his legal right to testify?' " *People v. Mills* (1968), 40 Ill. 2d 4, 8, 237 N.E.2d 697, 700.

Applying this test to the prosecutor's comment, we conclude that this single statement was not intended to direct the attention of the jury to the defendant Williams' failure to testify. (Compare *People v. Escobar* (1979), 77 Ill. App. 3d 169, 395 N.E.2d 1028; *People v. Edwards* (1979), 77 Ill. App. 3d 237, 395 N.E.2d 1095.)[3] We determine that reversal is not required here where the prosecutor observed that the evidence was uncontroverted.

Likewise, the prosecutor's comments during rebuttal argument that he would not apologize for the complainant's testimony and he would bring her into court any day, do not require reversal. Prior to these comments, the defense had characterized the victim's testimony as replete with lies. At least 19 times the defense stated the victim had lied. In conclusion, the defense argued:

> "Well, all we can do is just use our commonsense [*sic*] When we review this and come up with a conclusion that her story is—a fantasy. Something that belongs in daytime television
>
> * * *
>
> * * * I think you'll see that the whole story is false because of all the lies we have caught her in * * *
>
> But you're here as a safety valve to see that they don't lose their freedom because of a story like that.
>
> [Assistant State's Attorney]: Objection. Improper comment.
>
> [Court]: You'll be able to respond * * * Overruled."

■■ It is clear from the foregoing that the prosecutor's rebuttal remarks

---

[3] Defendant Williams cites numerous cases where the prosecutor made a single reference to defendant's failure to testify. In these cases, however, the comment was not merely "uncontroverted evidence" but rather a direct reference to the failure to testify. (*E. g., People v. Wollenberg* (1967), 37 Ill. 2d 480, 487, 229 N.E.2d 490, 494 ("No one else testified. Let's get that straight."); *People v. Hopkins* (1970), 124 Ill. App. 2d 415, 419, 259 N.E.2d 577, 579 ("any defendant * * * has the right to take the witness stand").) Again, we note the prosecutor may say the evidence is uncontradicted. *People v. Mills* (1968), 40 Ill. 2d 4, 237 N.E.2d 697.

were invited by the argument of the defense. A defendant may not complain of remarks which he has provoked or invited. (*People v. Mayfield* (1979), 72 Ill. App. 3d 669, 390 N.E.2d 1315; *People v. Weatherspoon* (1978), 63 Ill. App. 3d 315, 379 N.E.2d 847.) By virtue of the foregoing, we conclude that the prosecutor's closing argument was proper as invited response.

Accordingly, for the reasons indicated herein, we reverse the convictions of the defendants on the charges of aggravated kidnapping and direct the trial court, on remand, to vacate those judgments of conviction and the sentences imposed on those judgments. We also direct the trial court to vacate the judgment of conviction on the charge of aggravated battery.

We affirm the convictions and sentences on the charges of rape and deviate sexual assault.

Reversed in part and remanded; affirmed in part.

ROMITI, P. J., and JOHNSON, J., concur.